UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
DARLENE A. JACKSON,

Plaintiff,

-against-

NEW YORK STATE OFFICE OF MENTAL HEALTH – PILGRIM PSYCHIATRIC CENTER and MICHAEL IZZANO – DIRECTOR OF HR 6,

Defendants.
---------------------------------------------------------------------X

For Online Publication Only

FILED
CLERK
9/29/2026 12:18 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM & ORDER**
23-cv-04164 (JMA) (ARL)

**AZRACK, United States District Judge:**

Pro se Plaintiff Darlene A. Jackson brings this religious discrimination action against Defendants New York State Office of Mental Health – Pilgrim Psychiatric Center and Michael Izzano, (collectively, "Defendants"), based on Defendants' alleged refusal to grant Plaintiff a religious accommodation to its requirement that employees receive the COVID-19 vaccine, and the related suspension and termination of Plaintiff's employment. (Compl., ECF No. 1.) Before the Court are both parties' motions for summary judgment. (ECF No. 62; ECF No. 64.) For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.

## I. BACKGROUND

### A. Relevant Facts

The following factual background is drawn from Plaintiff's Complaint, (ECF No. 1), Plaintiff's and Defendants' statement of material facts pursuant to Local Civil Rule 56.1, (ECF No. 62-3 ("Pl. 56.1 Stmt."); ECF No. 64-2 ("Def. 56.1 Stmt."); ECF No. 64-27 ("Pl. Supp. 56.1 Stmt.")), the parties' oppositions to those statements, (ECF No. 62-13 ("Def. Resp. Pl. 56.1

Stmt."); ECF No. 64-26 ("Pl. 56.1 Counterstmt."); ECF No. 64-29 ("Def. Resp. Pl. Supp. 56.1 Stmt."), and the declarations with exhibits submitted by both parties in support of the instant motion, (ECF No. 62-2, 62-4–10; ECF No. 63-1–5; at 30–1225; ECF No. 64-3–22; ECF No. 64-30–33). The following facts are undisputed unless otherwise noted.[1]

**1. Plaintiff's Employment with OMH**

Defendant New York State Office of Mental Health ("OMH") is a department of New York State responsible for operating and managing psychiatric centers and secure treatment facilities across the State. (Def. 56.1 Stmt. ¶ 1.) The Yaphank Center is a psychiatric outpatient center located in Medford, New York, and run by Pilgrim Psychiatric Center ("Pilgrim"), an OMH-operated facility. (Id. ¶ 4.) The Center has approximately 40 staff members, including employees who staff mobile integration units that regularly visit clients at their homes. (Id.) Defendant Michael Izzano has been employed by OMH since 2012 and currently serves as Associate Commissioner of OMH. (ECF No. 64-3, Izzano Decl., ¶ 1.) During the relevant time period, Izzano was OMH's Director of Employee Relations. (Id.) Non-party John Mahon is the Mental Health Treatment Team Leader at the Yaphank Center, a position he has held since 2010. (Def. 56.1 Stmt. ¶ 15; ECF No. 64-18, Mahon Decl. ¶ 1.)

In July 2016, Plaintiff was appointed to a position of a "Social Worker Assistant 1, Grade 12" (SWA 1)" at Pilgrim Psychiatric Center, and began working on September 8, 2016. (Id. ¶ 7.) Plaintiff was hired to work as a "Managed Care Coordinator" for the Yaphank Center's outpatient

---

[1] Unless otherwise noted, a citation to a party's Rule 56.1 statement indicates that the Court has deemed the relevant fact undisputed. Any citation to a party's Rule 56.1 statement incorporates by reference the underlying documents cited in the statement. Where relevant, the Court may cite directly to an underlying document. The Court also notes that many of Plaintiff's responses purport to deny Defendants' statements of material fact but either do not actually controvert the statement or they purport to deny facts properly set forth by Defendants' 56.1 statement with a citation to evidence that does not support the purported denial. The Court deems undisputed the facts that are supported by citations to record evidence and are not specifically disputed with relevant citations to admissible record evidence. See Santander Consumer USA, Inc. v. City of Yonkers, No. 22-cv-8870, 2024 WL 4817649, at *1 (S.D.N.Y. Nov. 18, 2024) (citing Mae v. Quickway Estates LLC, No. 22-cv-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023)).

clinics. (Pl. Supp. 56.1 Stmt. ¶ 1; see Mahon Decl. ¶ 2.) Two years later, she was promoted from SWA 1 to "Social Work Assistant 2, Grade 14 (SWA 2)." (Id. ¶ 8.) The SWA 2 position requires a social work background, and, according to the official New York State Department Civil Service Classification Standard, the duties of the position include: "interviewing individuals, their families, and/or others to gather background information; determining eligibility for services; advocating on behalf of and assisting individuals in identifying and obtaining services; working with interdisciplinary treatment teams and participating in the development and implementation of treatment and service plans; coordinating services between agencies." (Def. 56.1 Stmt. ¶ 2; see Mahon Decl. ¶ 2; see also ECF No. 64-31, Reply Decl. Ex. A (NYS Department of Civil Service Classification Standard for SWA 2).)

Plaintiff does not dispute that she was classified as an SWA 2, nor does she dispute that the official duties of her classification included those tasks. However, Plaintiff maintains that, notwithstanding her title, the listed duties did not reflect her assigned responsibilities. (ECF No. 62-2 ("Pl. Decl.") ¶ 3.) Plaintiff's version of her job duties and responsibilities varies considerably from the duties listed in this job description. According to Plaintiff, in her role as Managed Care Coordinator:

> My duties were strictly administrative. I did not meet with patients, conduct intakes, or perform clinical services. I worked in OMH's electronic systems verifying insurance, maintaining managed care records, and supporting billing and Medicaid-related documentation.

(Id.) Plaintiff also attests that: "OMH now asserts duties I never performed—such as advising clients on Medicaid eligibility, issuing 'award letters,' or conducting intake tasks. These do not appear in any contemporaneous document and were factually impossible for my position." (Id. ¶ 19.)

Defendants dispute Plaintiff's conclusory characterization of her job responsibilities and instead state that "[m]any essential duties of Plaintiff's position required face-to face interaction

with patients, their family, and facility staff." (Def. 56.1 Stmt. ¶ 10 (citing Mahon Decl. ¶ 3; Izzano Decl. ¶ 3).) Moreover, according to Defendants, at the Yaphank Center, it was "all staff's responsibility, including the Plaintiff, to help the clients, who all have mental illnesses, to feel like their needs are being met by securing certain benefits, including arranging transportation, having case managers, etc., to assist in the clients' overall treatment outcome and to assist them in living in the community." (Id. ¶ 12.) And, "[s]hould one of these clients have a managed care issue or a Medicaid spenddown issue, Plaintiff would have been responsible for sitting down with the client and reviewing what was happening with them and then following up with the Medicaid Overage[sic] office."[2] (Id. ¶ 12–13.) According to Defendants, this "personal one-on-one interaction by all Yaphank staff and its clients, who have mental illnesses that can cause them to be agitated and loud at times," was essential "to build rapport and develop trust" with clients. (Id. ¶ 14.) Defendants also state that "[i]n addition to her managed care coordinator duties, Plaintiff, as a SWA 2, could have also been asked to assist with regular SWA 2 tasks as part of the requirements of her position." (See Mahon Decl., ¶¶ 2–3; Def. Resp. Pl. 56.1 Stmt. ¶ 1.)

[2] A Medicaid "spend-down" refers to the process by which a Medicaid applicant whose income exceeds the eligibility limit may apply incurred medical expenses toward excess income to qualify for Medicaid coverage. (Pl. Counterstmt. ¶ 22.) Plaintiff claims that she "did not meet with clients to discuss Medicaid spend-down or managed care issues," asserting that eligibility was "determined solely by the Medicaid financial eligibility office" and the Center's "only role was to electronically confirm client attendance" for Medicaid recipients who had already been approved." (Id. ¶ 13.) She also disputes that it was "all staff's responsibility" to assist clients in securing benefits, claiming that "[t]hese were duties of licensed clinical staff, care managers, and peer specialists, not Plaintiff." (Id. ¶ 12.) In support of these contentions, Plaintiff cites her own declaration, as well as her annual performance evaluations from 2016 to 2021, (ECF No. 62-5), OMH's March 2020 guidance authorizing the use of telehealth for OMH-funded programs, (ECF No. 62-6), and a self-created chart which lists Plaintiff's "documented duties" and her self-assessment of their remote-capability. (ECF No. 62-9, Ex. Z). As explained infra, Plaintiff's citations do not support the propositions they are cited for. Moreover, even if Plaintiff was not expected to assess eligibility or assist clients in securing benefits, she offers no evidence to rebut Defendants' contention that her in-person presence was necessary to build trust with clients and explain their benefits and managed care plans.

**2. The COVID-19 Pandemic and Vaccine Mandate**

During the early months of the COVID-19 pandemic, beginning in March 2020 and continuing until July 2020, only 10 out of the Yaphank Center's 40 employees worked onsite.[3] (Def. 56.1 Stmt. ¶ 15.) During this time period, Plaintiff and approximately 30 other employees were allowed to work from home due to the need to limit the number of employees on site for safety reasons. (Id. ¶ 16.)

According to Defendants, the onsite employees—including Intake Coordinator Lisa Sullivan and LMSW Kerry Anderson—would "cover Plaintiff's duties that could not be done remotely in addition to their own regular duties," including "meeting personally with the clients and their families, to explain and assist them in completing various financial forms. (Id. ¶¶ 18–19 (citing ECF No. 64-21, Sullivan Decl. ¶ 4; ECF No. 64-22, Ashkenazy Decl. ¶¶ 3–4.) Moreover, Defendants state that while Plaintiff was working remotely, "it was necessary to first contact Plaintiff at home regarding each new client, which added approximately 20-25 minutes per client," and, "if any clients had questions regarding spend downs, the clients would have the burden of having to reach out to the Plaintiff by telephone, which added an extra layer of red tape."[4] (Id. ¶¶ 20–21.) Further, "all primary clinicians were sporadically asked to have their clients sign all of the managed care forms that Plaintiff would have handled had she been onsite." (Id. ¶ 24.) Plaintiff vaguely disputes that other employees covered her duties, claiming that she "[t]here were no documented performance deficiencies or operational disruptions during this period" and "continuing my telework would not have required any operational changes or additional costs.

[3] In March 2020, at the outset of the COVID-19 pandemic, OMH issued COVID-19 telehealth guidance, which, among other things, authorized providers in outpatient clinics such as the Yaphank Center, to provide services remotely, and allowed for verbal consent for admissions and treatment plans when in-person signatures were impracticable. (Pl. 56.1 Stmt. ¶ 44; see, e.g., ECF No. 62-6, Ex. P.)

[4] Plaintiff's declaration does not specifically dispute that when she worked remotely, these declarants contacted Plaintiff via telephone about these clients or that clients contacted her via telephone.

(Jackson Decl. ¶¶ 3–4.) She further claims she performed no duties related to "patient intake, obtaining signatures, or conducting direct client interviews." (Id. ¶¶ 6).

In July 2020, OMH's Central Office in Albany sent a memorandum indicating that all facilities would be phasing employees back to return to work onsite, starting with one day per week, and increasing over time to two days. (Def. 56.1 Stmt. ¶¶ 26–27.) OMH required all employees to take the COVID-19 vaccine or submit to weekly COVID-19 testing; Plaintiff chose the second option. (See Compl., ECF No. 1 at 6.) By March 2021, all of the Yaphank Center's employees, including Plaintiff, had returned to onsite work. (Id. ¶ 28.) According to Mahon, there were no other Managed Care Coordinators in any OMH facilities who were allowed to work remotely once the gradual return to onsite work began in July 2020.[5] (Id. ¶ 34; see Mahon Decl. ¶¶ 7–9.)

In August 2021, the COVID-19 pandemic was "surging in New York, with daily positive cases up over 1000% over the course of six weeks." Does v. Hochul, 632 F. Supp. 3d 120, 128 (E.D.N.Y. 2022) (internal citation omitted); see id. at 127 n.1 ("[T]he Court may take judicial notice of facts regarding COVID-19."). Later that month, the New York State Department of Health adopted an emergency rule ("Section 2.61") directing hospitals, nursing homes, hospices, adult care facilities, and other identified healthcare entities to "continuously require" certain of their employees to be fully vaccinated against COVID-19.[6] (Def. 56.1 Stmt. ¶ 38 (citing 10 N.Y.C.R.R. § 2.61)); see We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 274 (2d Cir.), clarified, 17 F.4th 368 (2d Cir. 2021), cert. denied sub nom. Dr. A. v. Hochul, 142 S. Ct. 2569

---

[5] Plaintiff disputes this and claims that OMH "has produced no evidence identifying any other Managed Care Coordinator positions . . . or whether those individuals were permitted or prohibited from remote work," (Pl. Counterstmt. ¶ 34), but offers no evidence of her own to counter this claim. Similarly, she offers no evidence to counter Defendants' claim that, by March 2021, all the Center's employees had returned to onsite work. (Def. 56.1 Stmt. ¶ 28; see Pl. 56.1 Counterstmt. ¶ 27 (claiming that "[c]linical staff continued hybrid or remote schedules" after March 2021, citing employee timesheets, but failing to identify any employees who worked fully remotely).)

[6] Section 2.61 was repealed effective October 4, 2023. See Vol. XLV, Issue 40 N.Y. Reg. 22 (Oct. 4, 2023).

(2022). That rule applied to "those employees, staff members, and volunteers 'who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.'" (Def. 56.1 Stmt. ¶ 38 (quoting 10 N.Y.C.R.R. § 2.61(a)(2)).

After the emergency rule was issued, Mahon had morning meetings with staff during which they discussed the vaccine requirement. (Id. ¶ 39.) Defendants claim that Mahon also had meetings with Plaintiff alone to discuss the need to take the vaccine, and that Plaintiff never mentioned in these conversations that she did not want to get the vaccine because of her religion. (Id. ¶¶ 39, 41.) Plaintiff denies that she had individual meetings with Mahon to discuss her decision whether or not to be vaccinated. (Pl. Counterstmt. ¶ 40.) She admits that, until she submitted her Religious Accommodation request in October 2021, she never disclosed the religious basis for her objection and states she had no legal obligation and no reason for doing so. (See id. ¶¶ 41–43.)

On October 6, 2021, OMH published an Emergency Regulation mandating COVID-19 vaccination, which went into effect immediately upon filing and required that all staff working in OMH facilities be vaccinated. (Def. 56.1 Stmt. ¶¶ 44–45.) The Regulation further provided that "[c]ommencing on October 12, 2021, all Staff who work in Hospitals who are not Fully Vaccinated shall be tested for COVID 19" as set forth in the provisions of the Regulation and that "[a] reasonable accommodation may be made for Staff who have a documented pre-existing health condition that prevents them from complying with the vaccine requirements herein." (Id. ¶ 46.)

**3. Plaintiff's Reasonable Accommodation Request**

On October 25, 2021, Plaintiff submitted an Application for a Reasonable Accommodation of a Religious Observance or Practice (RA). (Id. ¶ 15; see ECF No. 64-8, Izzano Decl., Ex. E.) In the Application, Plaintiff requested an exemption from the vaccination requirement, stating that

receiving the COVID-19 vaccine would violate her Christian religious beliefs, and that she sought "to continue wearing a mask and receive weekly [COVID-19] testing or work remote or hybrid." (See Izzano Decl., Ex. E.)

On November 2, 2021, a staff member of OMH's Human Resources (HR) Department emailed Plaintiff to notify her that OMH had received her Application but that "[d]ue to the high volume of applications at this time, a response might be delayed." (Id. ¶ 19.) The email clarified while the application was pending, Plaintiff would not be suspended for failure to comply with the vaccination mandate. (Id.) On November 8, 2021, Plaintiff spoke to an HR representative by phone to discuss her accommodation request. (Id. ¶ 20 (citing ECF No. 64-10, Izzano Decl., Ex. G.) During the conversation, Plaintiff stated that although her job title was SWA 2, she actually worked in the outpatient clinic as a "Managed Care Coordinator," and claimed that she had no patient-facing duties. (Id. ¶ 23.) During the conversation, Plaintiff stated that she would be open to weekly testing, masking, and/or remote work as alternatives to vaccination. (Id. ¶ 22.)

On November 15, 2021, OMH sent Plaintiff a letter from Defendant Michael Izzano, Director of the Bureau of Employee Relations at OMH, informing her that her accommodation request was denied. (Id. ¶ 24; see ECF No. 64-11, Izzano Decl., Ex. H.) Attached to that letter was an additional notice confirming that OMH was "unable to accommodate your request to be exempt from the COVID-19 Vaccine Mandate" because "[as a] Social Work Assistant 2, your job requires you to be involved in a patient area and share space with patient-facing staff. No other alternatives can be offered that would ensure the safety of staff and patients and maintain compliance with the mandate." (Def 56.1 Stmt. ¶ 25; see Izzano Decl., Ex. H.) The same day, Plaintiff received notice that she would be suspended without pay if she were not vaccinated by November 22, 2021. (Def. 56.1 Stmt. ¶ 30–31.) Plaintiff remained unvaccinated and OMH

accordingly suspended Plaintiff without pay on November 23, 2021. (Def. 56.1 Stmt. ¶ 31.) In September 2022, Plaintiff was notified that OMH terminated her employment. (Compl. at 8.)

#### 4. Plaintiff's Grievance and Arbitration Decision

Plaintiff subsequently filed a grievance regarding her termination. (Id. ¶ 34.) An arbitration hearing was held in July 2022, and in September 2022, the arbitrator upheld her termination. (Id. ¶ 34; see ECF No. 64-15, Izzano Decl., Ex. L.) Specifically, the arbitrator rejected the argument that Plaintiff's job duties did not require her to have contact with co-workers or patients, and found that he needed to defer to the Yaphank Center's job description requiring Plaintiff to be in person. (Def. 56.1 Stmt. ¶¶ 36–41; see Izzano Decl., Ex. L (finding that "the employer, not the employee, determines job duties and job descriptions"). The arbitrator also determined that Plaintiff's job duties fell under those governed by the vaccination mandate, that the mandate was "both reasonable and work-related," and that in terminating Plaintiff "OMH acted out of concern for the safety of patients under its care in the various facilities controlled by OMH." (Izzano Decl., Ex. L.)

### B. Procedural History

The Court assumes the Parties' familiarity with the factual background and procedural history of this case as described in its prior Memorandum & Order on Defendants' motion to dismiss, (see ECF No. 23 ("May 2024 Mem. & Order")), and will therefore recount them only insofar as relevant to the instant Motion.

In November 2021, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") asserting that Defendants subjected Plaintiff to religious discrimination when her accommodation request was denied and she was subsequently terminated. (See May 2024 Mem. & Order at 5.) On February 18, 2022, Plaintiff filed a similar charge of discrimination with the U.S. Equal Employment Opportunity Employment Commission ("EEOC"). (Def. 56.1

Stmt. ¶ 43.) On March 29, 2023, the EEOC made no finding as to the merits of Plaintiff's charge and issued her a right-to-sue letter. (Id. ¶ 44.)

On May 22, 2023, Plaintiff initiated this action by filing the pro se Complaint. (Compl.) The Complaint asserted that Defendants committed religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.5.C. §§ 2000e et seq. ("Title VII"), and the New York State Human Rights Law, N.Y. EXEC. LAW §§ 290 et seq. ("NYSHRL"), by declining Plaintiff's request for a religious accommodation from the OMH's mandatory vaccine policy and later suspending and terminating Plaintiff's employment. (Id. at 3-5.).

On February 6, 2024, Defendants filed a motion to dismiss the Complaint. (ECF No. 18.) On May 1, 2024, the Court granted in part and denied in part Defendants' motion. (May 2024 Mem. & Order.) Initially, the Court dismissed Plaintiff's NYSHRL state law claims for lack of jurisdiction, because the NYSDHR had not yet rendered a decision on her complaint. (Id. at 8–10.) As for Plaintiff's Title VII claim, the Court first found that Plaintiff had met each of the three prima facie elements required to state a Title VII religious discrimination claim based on failure to accommodate: (1) she pled a bona fide religious belief conflicting with taking the COVID-19 vaccine; (2) she informed her employer of this belief when she submitted her religious accommodation request; and (3) she was suspended without pay and ultimately terminated for failing to comply with the conflicting employment requirement. (Id. at 10–14.) The Court then found that Defendants had shown that some, but not all, of Plaintiff's requested accommodations would present an undue hardship. Specifically, the Court found that Plaintiff's requested accommodations involving in-person work—i.e. her requests for weekly testing or a "hybrid" schedule of reduced in-person work—without taking the COVID-19 vaccine would have imposed an undue hardship as a matter of law by requiring Defendants to violate New York State's vaccine mandate under Section 2.61. (Id. at 14–16.) However, the Court found that it could not conclude

at the motion to dismiss stage that allowing Plaintiff to work fully remotely would impose an undue hardship. (Id. at 16–18.)

On December 22, 2025, Plaintiff filed her fully briefed motion for summary judgment on liability, (ECF No. 62), and the following day, Defendants filed their fully briefed motion for summary judgment, (ECF No. 64.)

## II. LEGAL STANDARD

Under Rule 56, a moving party is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Choi v. Tower Research Capital LLC, 2 F.4th 10, 16 (2d Cir. 2021); see also McKinney v. City of Middletown, 49 F.4th 730, 737 (2d Cir. 2022) ("No genuine dispute of material fact exists when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.") (internal quotation marks omitted). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018) (internal quotation marks omitted). The movant can "point[] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Id. (cleaned up). Once the moving party carries its burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." McKinney, 49 F.4th at 738 (internal quotation marks omitted). In this analysis, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." ING Bank N.V. v. M/V Temara, 892 F.3d 511, 518 (2d Cir. 2018).

"Cross-motions for summary judgment do not alter [this] basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." AFS/IBEX v. AEGIS Managing Agency Ltd., 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). A court need not grant summary judgment for either party, "[r]ather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

"Although district courts must liberally construe pro se filings, particularly in the summary judgment context, that liberal construction does not alter the applicable evidentiary burdens." Minto v. Molloy Univ., 715 F. Supp. 3d 422, 430 (E.D.N.Y. 2024) (cleaned up) (citing Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014); Vasquez v. Warren, 630 F. Supp. 3d 524, 535 (S.D.N.Y. 2022)).

## III. DISCUSSION

Defendants seek summary judgment on the grounds that Plaintiff's Title VII claim fails because granting Plaintiff's request to work fully remotely would impose an undue hardship on Defendants. (ECF No. 64-1 ("Def. Mem.") at 1.) Because the Court concludes that, on the present record, considered in the light most favorable to Plaintiff, no reasonable jury could find that an undue hardship would not result from granting Plaintiff's requested accommodation, the Court grants Defendants' motion for summary judgment dismissing Plaintiff's Title VII claim.

### A. Religious Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title

VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Accordingly, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Trans World Airlines. Inc. v. Hardison, 432 U.S. 63, 74 (1977).

To establish a prima facie case of failure to accommodate under Title VII, plaintiffs "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'" Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (quoting Knight v. Conn Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001)). "Once a prima facie case is established by the employee, the employer must offer him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." Hale v. Vidal, No. 22-2973, 2023 WL 7211909, at *2 (2d Cir. Nov. 2, 2023) (quoting Baker v. Home Depot, 445 F.3d 541, 546 (2d Cir. 2006)); see, e.g., Bergin v. New York State Unified Ct. Sys., No. 25-721, 2026 WL 2724974, at *3 (2d Cir. Sept. 15, 2026) (stating that, once the Court has determined the plaintiff has stated a prima facie case, the Court then "determines whether the employer "offer[ed] him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.").

**B. Plaintiff's Proposed Title VII Accommodation of Fully Remote Work Would Impose an Undue Burden on Defendants.**

The sole issue is whether Defendants could have granted Plaintiff's requested accommodation of fully remote work without undue hardship.

In Groff v. DeJoy, 600 U.S. 447, 468 (2023), the Supreme Court clarified that a proposed accommodation represents an undue hardship when it poses "a burden [that] is substantial in the overall context of an employer's business." See D'Cunha v. Northwell Health Sys., No. 23-cv-476, 2023 WL 7986441 (2d Cir. Nov. 17, 2023). "A reasonable accommodation can never involve the elimination of an essential function of a job, and a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Russo v. Patchogue-Medford Sch. Dist., No. 22-cv-01569, 2024 WL 149131, at *5 (E.D.N.Y. Jan. 12, 2024), aff'd, 129 F.4th 182 (2d Cir. 2025) (cleaned up) (citing Tafolla v. Heilig, 80 F.4th 111, 119 (2d Cir. 2023)). "To determine the essential functions of a job, courts in this Circuit conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice, in which they draw all inferences in favor of the non-moving party." Baker v. Bridge Inc., 805 F. Supp. 3d 521, 545 (S.D.N.Y. 2025) (cleaned up) (citing Tafolla, 80 F.4th at 119). "Factors relevant to whether an aspect of a job is an essential function 'include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." Id. (citing McMillan v. City of New York, 711 F.3d 120, 127–128 (2d Cir. 2013)). In assessing whether a job function is essential, "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (cleaned up).

Here, Defendants argue that Plaintiff's requested accommodation to work fully remotely was unreasonable because in-person work was an essential function of her position. Defendants contend that many of the "essential duties" of Plaintiff's position as a SWA 2 "required face-to-face interaction with patients, their families, and facility staff"—including "advocating on behalf

of and assisting individuals in identifying and obtaining services; working with interdisciplinary treatment teams and participating in the development and implementation of treatment and service plans; coordinating services between agencies, programs, and providers; and following-up to ensure that individuals' needs were met." (Def. Mem. at 4 (citing Mahon Decl. ¶ 3); see also Reply Decl. Ex. A (New York State Department of Civil Service Classification Standard for Social Work Assistant 2).) Defendants further assert that face-to-face interaction was particularly important for all Yaphank Center staff because of the special needs of the population the Center serves. (See, e.g., Def. Mem. at 4–5 (explaining that "the clientele of the Yaphank Center . . . have mental illnesses and can become agitated and loud at times and do better with one-on-one interactions with staff who build rapport and develop trust with them."; id. (explaining that in-person interaction helps clients "to feel like their needs are being met").) Finally, Defendants contend that permitting Plaintiff to work fully remotely would have imposed additional costs by requiring other employees to cover her in-person duties—such as "meeting personally with the clients and their families, to explain and assist them in completing various financial forms"—as they did during the earlier months of the COVID-19 pandemic. (Def 56.1 ¶ 19.) In opposition, Plaintiff asserts that (1) the "SWA 2" title does not reflect her assigned responsibilities, which she contends were purely administrative in nature; (2) face-to-face interaction was necessary only for other employees who conducted intake and other client-facing duties, not Plaintiff, whose duties could be performed without it; and (3) her consistently positive job evaluations during the pandemic, together with OMH's telehealth guidance authorizing remote work, further demonstrate that she is able to perform her job remotely without issue and that her job duties did not include patient interaction. (See ECF No. 64-24 ("Pl. Opp.") at 4–11; see also Pl. Decl. ¶¶ 4–6.)

The Court agrees with Defendants that no rational jury could find that in-person work was not an essential function of Plaintiff's position. Initially, Plaintiff's only support for her assertion

that her duties were purely administrative and limited to "verifying client insurance coverage via insurance portals, submitting authorization requests, and managing managed care electronic databases" is her own declaration.[7] That assertion is contradicted by Defendants' other evidence, including Plaintiff's official job description and declarations from Yaphank Center and OMH supervisors and staff, which establish that her responsibilities were broader and more varied. (see, e.g., Def. 56.1 Stmt. ¶ 9–10 (citing Mahon Decl. ¶ 2 and Izzano Decl ¶ 3); ECF No. 64-31, Reply Decl. Ex. A (NYS Department of Civil Service Classification Standard for SWA 2); see also Raspardo v. Carlone, 770 F.3d 97, 128 (2d Cir. 2014) ("Although we must view the facts in the light most favorable to the plaintiffs and take the allegations and facts as adduced by the plaintiffs, we need not accept conclusory allegations that are either contradicted by or lack support in the record.").

Moreover, even accepting, as Plaintiff contends, that some of the official SWA 2 duties were not part of her actual assigned responsibilities—for example, accepting that she had no role in client intake or in directly securing benefits for clients—it was still her role to enroll clients in benefits, verify their eligibility, and submit authorization requests. Defendants contend that these duties included a responsibility to answer client questions, assist clients in completing the necessary authorization forms, and, more broadly, "to *educate*, *explain*, and *assist* the Yaphank clients" regarding obtaining benefits and services. (Def. Reply. Br. at 3 (emphasis in original).) In support of this assertion, Defendants submit Pilgrim's official documents describing the duties

[7] Plaintiff also cites her annual performance evaluations from 2016 to 2021 as evidence that her tasks were solely "administrative and non-clinical." (Pl. 56.1 Stmt. ¶ 2 (ECF No. 62-5, Ex. F).) However, her evaluations do not prove, as she contends, that she was never assigned patient-facing responsibilities or in-person requirements. Instead, they support Defendants' characterization of her duties as more varied and requiring in-person interaction with clients and other staff. For example, she was evaluated on, among other things, her ability to "[r]esolve managed care operational issues, such as authorization for services"; "[d]evelop, manage[], and sustain[] relationship with managed care organizations" and [k]eep open communication with providers on managed care requirements"; "[s]upervise . . . the personnel on the managed care team and provide direction and support to Site Managers, Clinicians, Prescribers, and Clerical staff"; "monitor[] staff time and attendance;" "[p]ursue[] opportunities to expand cultural and linguistic awareness as availability permits and/or is dictated by client need"; and "[s]upport and cooperate[] with facility initiatives and implementation of new programs or procedures." (ECF No. 62-5, Ex. F, at 99–101 (PDF pagination).)

of Managed Care Coordinators, as well as an email from Plaintiff herself to another Managed Care Coordination at another facility. Specifically, Pilgrim's "7 Steps for [Outpatient] Registration" outlines a seven-step process for Managed Care Coordinators to enroll clients, which includes reviewing forms with clients and obtaining their signatures. (See ECF No. 64-32 ("Intake/Admission – Collect patient information, and insurance card"), Def. Reply Decl. Ex. B; see id. (listing various insurance forms and questionnaires to complete with patients).) In her email to a Managed Care Coordinator at another facility, Plaintiff herself described her job duties and identified the forms clients were required to complete for registration. This email states, inter alia, that "We always try to collect copies of the insurance cards but sometimes the client does not have it at intake but they should be reminded to bring the card with them during the first intake." (See ECF No. 64-33, Reply Decl. Ex. C (emphasis added).) Plaintiff's conclusory declaration never attempts to explain this statement that Plaintiff authored or the fact that the 7 Steps for OP Registration Document explicitly states "Intake/Admission – Collect patient information, and insurance card." These statements contradict Plaintiff's conclusory statements in declaration that she did not meet with patients or conduct intakes.

These materials contradict Plaintiff's assertion that the managed-care tasks are purely administrative and require no face-to-face interaction, and the Court defers to Defendants' judgment that it was an essential function for the Managed Care Coordinator tasks to be in-person. See, e.g., Shannon, 332 F.3d at 100 (holding that in assessing whether a job function is essential, "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."). Moreover, declarations from Yaphank Center supervisors and employees establish that all Yaphank Center staff were expected to help make clients feel like their needs were being met, which Defendants contend required in-person

interaction given the population served. Indeed, after the pandemic, the Center maintained no remote positions and had returned all employees to some degree of in-person work.

Additionally, even assuming that the SWA 2 description did not reflect Plaintiff's actual assigned job responsibilities as a "Managed Care Coordinator," her official position was a SWA 2, and Defendants could ask her to perform additional tasks falling within the scope of that position at any time. See Hunt-Watts v. Nassau Health Care Corp., 43 F. Supp. 3d 119, 129 (E.D.N.Y. 2014) ("Plaintiff cites no authority, and the Court finds none, for the proposition that simply because one did not perform all of the essential functions of a position, those functions are not essential."); Sheafe-Carter v. Donohue, No. 11-cv-04128, 2013 WL 4458746, at *6 (E.D.N.Y. Aug. 16, 2013), aff'd sub nom. Sheafe-Carter v. Donahoe, 579 F. App'x 44 (2d Cir. 2014) ("[T]he Second Circuit has made it clear that the suggestion that the essential requirements might be waived or that coworkers might perform the [functions] is not a suggestion for reasonable accommodation since these tasks were essential functions of the job.").

Plaintiff's argument that her performance during the COVID-19 pandemic demonstrates that she could perform her job remotely is similarly unavailing. (See, e.g., Pl. Opp. at 9 ("OMH offered no documentation of delay, disruption, or service complaints resulting from Plaintiff's remote work, despite her having performed these duties remotely for a year.") It is well established that the temporary adjustment during COVID-19 "does not deprive in-person work of its status as an essential function." Baker v. Bridge Inc., 805 F. Supp. 3d 521 (2025); see also Balchan v. N.Y.C. Horn. Auth., No. 21-cv-10326, 2025 WL 588021, at *8 (S.D.N.Y. Feb. 24, 2025) ("[T]he fact that NYCHA voluntarily modified the plaintiff's job duties from April 2020 to July 2021 does not render fieldwork a non-essential function of the plaintiff's position."). Plaintiff's assertion that OMH's distribution of laptops to employees reflects "clinic-wide transition to remote access" is conclusory and not supported by the record, which shows that all employees returned to on-site

work after the pandemic. (See Pl. Supp. 56.1 Stmt. ¶ 11 (claiming that, in November 2020, OMH "replaced desktop computers for Plaintiff and other Yaphank staff with work-issued laptops and carrying cases, consistent with a clinic-wide transition to remote access").) Nor do telehealth policies authorizing aspects of remote work establish that in-person work was not an essential function. See Baker, 805 F. Supp. 3d at 524 (explaining that the fact that a mental health rehabilitation program temporarily "permitted workers to perform some services remotely during the pandemic, pursuant to a suspension of normal requirements by OMH and DOHMH due to a public health emergency . . . does not deprive in-person work of its status as an essential function").

Finally, Plaintiff offers no evidence to counter Defendants' assertion that permitting Plaintiff to work remotely would have imposed a hardship by requiring other employees to cover her in-person duties.[8] Courts have recognized that an employer need not accommodate an employee by eliminating or transferring essential in-person duties to other employees. Cf. Brown v. S. Shore Univ. Hosp., 762 F. Supp. 3d 191 (E.D.N.Y. 2025) ("To the extent that Defendants could have accommodated [Plaintiff's] alleged religious belief by placing [her] in a remote position, courts in this Circuit have found that such an accommodation would result in an undue hardship on hospital defendants . . . because such employers would have to hire another employee to perform an employee's in-person duties."); Conde v. Mid Hudson Reg'l Hosp. Med. Ctr., No. 22-cv-3085, 2024 WL 168282 at *8 (S.D.N.Y. Jan. 12, 2024) (explaining that allowing a patient-facing nurse to work remotely would burden the defendant hospital, as "another nurse would have had to cover those duties or defendants would have needed to hire a replacement nurse"); Russo v. Patchogue-Medford Sch. Dist., 22-cv-01569, 2024 WL 149131 (E.D.N.Y. Jan. 12, 2024) (holding that allowing plaintiff, a school psychologist, to work remotely would cause undue

[8] Plaintiff offers no support for her claim that "[s]taff did not have access or authorization to perform Plaintiff's duties, which required managed-care system logins and external portal credentials," (Pl. Counterstmt. ¶ 30), nor does she offer any evidence to counter Defendants' assertion that other employees were forced to cover the client-interaction components of her position.

hardship by forcing the defendant school district to "delegat[e] her in-person responsibilities to other employees").

## IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in its entirety, and Plaintiff motion for summary judgment is DENIED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Date: September 29, 2026
Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE